Thank you for being here early. This is 4100268, the Wright Graduate Institute for Human Performance v. The Illinois Board of Higher Education. We have for the appellant, Carl Draper, and for the appellee, Paul Risseck. Mr. Draper. Thank you, your honor. May it please the court and counsel, we're here today to review an administrative decision from the Illinois Board of Higher Education on a fact pattern that's relatively straightforward. In administrative law, one of the basic principles that guides all these decisions is that administrative agencies, being creatures of statute, need to apply the statutory authority that has been given to them by the General Assembly. And then to announce by way of proper rulemaking procedures and policies that they will implement pursuant to that enabling legislation. If that had been done, in this case, the Illinois Board of Higher Education would have approved the application of the Wright Graduate Institute to operate a program here in the state of Illinois. Now, much of the briefing and the arguments the court will hear today or have read in the briefs deals with arguments about which rules apply, how they were applied by the board. And I think that the easiest way to understand all of the issues that are before the court is to first simply look at the written decision that was presented. In this case, by law, the board had its staff conduct an analysis and present a written report that was the subject matter then of the board hearing. And the board followed its, correctly followed its rules on that. The decision is sent forth in the appendix as well as in the record. In the appendix, it's four pages long beginning with page A5. In reviewing that, we will be able to eliminate many issues that are simply not relevant to this case and do not govern. Looking at the first page of the analysis that the staff prepared and which then became the decision of the board, the first three paragraphs identify the proposed program titles and identify that the Wright Graduate Institute made an application to operate in the state of Illinois for programs of instruction, all three in the field of human development. Now elsewhere in the record, it's clear that these programs are being offered under the authority of the state of Wisconsin that had approved its institution in Wisconsin to confer these degrees there. So the question before the board was simply permission to operate in Illinois and thereby have its administrative functions operated or to conduct some limited coursework, but no application was pending for actually conferring degrees. That's a separate issue we'll address in a moment. So the board recognized that at the beginning. The other thing that the board recognized at the beginning in its background in history was that the institution had originally submitted an application to both operate and to confer degrees, but later decided to withdraw the request to confer degrees and work on that more and instead to simply have the operational authority. The board on page one indicates that its review is under the private college act and it recites correctly the six standards under that act that have to be reviewed for approval. On the next page, which would be A6 of the appendix, the board also notes the administrative rules that apply and all of the administrative rules that were promulgated and govern the requirements for this are set forth in the Illinois Administrative Code at the citation given. We'll be referring to section 1030.30 repeatedly throughout the briefs or argument. Again, the staff recommendation and rationale identified three different programs that were being operated in Wisconsin for which instruction could be offered in Illinois and all three areas were identified as degrees in the field of human development. Later on that page, there are three paragraphs and only three paragraphs devoted to the analysis of the first deficiency that the staff used to recommend to the board to deny the application. The first one in 1030.30A1 requires that the objectives for the institution and the degree program be consistent with what the institutional name and degree programs imply. There has to be some connection between the institutional name and the name of the degree program. The degree programs here are advanced degrees in human development and the name of the institution, the Wright Graduate Institute for Human Performance, certainly is consistent with that and will address it. Going on to the next page, just to identify some legal authority on page A7, the staff identified a second criterion that is claimed to be deficient in this application and that is found in that same general section as 1030.30A4. That criterion requires that the education experience and other qualifications of faculty, staff, and instructors shall ensure that students will receive education consistent with the objectives of the course of the program or study. Notably, this criterion does not say that those have to be objectives of the degree that might be conferred and that is important because in this case the degree that might be conferred is not an Illinois issue and was not before this board. The analysis under this section goes on in its first paragraph to identify that the basis for this decision is based upon an unpromulgated policy and procedures manual for operating and degree granting authority. And then the analysis of that follows. The last page simply concludes that the faculty identified in this application don't have proper degrees according to staff in the discipline of education. Therefore, that criterion wasn't met. I want to back up now and... Let me interject real quick because in the staff conclusion they reference sections 1030.30 which you've talked about and 1030.60. What is 1030.60 because I don't see any reference to that rule in the staff recommendation. There are none and we don't know why that provision is in there. When we go back to the first of the two criteria that are asserted as disqualifying, the criteria under A1, and again we'll be back in the decision in the appendix at page 6. The staff begin its analysis by indicating that the proposed programs in human development were identified with a classification code, a numerical code that we've discussed in the brief and it's often referred to as the CIP code. That CIP code comes from a federal classification system for statistical analysis of education programs. We believe it has no bearing on this and it's an arbitrary classification to use but that's not the thrust of our argument here. Our argument here is that that CIP code is something that is requested on the cover of the application for degree granting programs. For degree granting programs there's an important analysis of not only the coursework and the institution's basic ability to provide education but also on faculty qualifications if indeed faculty are going to be conferring degrees on graduate students. In the original application, which sought degree granting authority, a CIP classification was given. However, as the decision itself even recognizes, as the brief of the board recognizes that application was amended and all of the requirements for degree granting authority were withdrawn, that CIP code classification is not an element requested in the application for operational authority. It simply isn't. It was on the cover sheet of the application and staff incorrectly continued to look at that classification code for operating authority when it has no application to that whatsoever. Because of that, staff continued to ignore that the programs of study would be in the field of human development, which was going to be a multidisciplinary program that covered various aspects of human development, something beyond just classroom theoretical instruction. In the second paragraph of this analysis, the staff recognized that the proposed programs are in human development, but then they state, nevertheless, the classification of instructional program lists the category of education that is the program that's being focused on and conclude, hence, the programs in human development are not programs in education according to instructional taxonomy. Quite frankly, that's bureaucratese for we want to have a decision that is focused on some arbitrary numerical system used for statistical analysis and make substantive decisions about the quality and content of a program of education that's being offered by an institution of higher education. In the final paragraph under this particular section, again, the written report that became the decision states that the institution's description of human development programs contradicts the CIP code. And so the CIP code has now become the be all and end all of the staff analysis, leading the board to an erroneous decision that because education was listed in the original application, this application for operation, simply to offer some administration and coursework in Illinois, should be denied. In the board's brief, there are at least 11 pages devoted to arguments about the disconnect between the CIP code education on the one hand and coursework in human development. And all of it has absolutely no bearing because nowhere in the board's rules have they required a CIP code classification to be selected. And in fact, even when we go to the unpromulgated manual with the forms and the instruction on how to make the application, the CIP code is not requested for this particular kind of decision. Page 8 of the board's brief argues that this application is more closely aligned with psychology or counseling. And I agree. The proposal was for education in the field of human development. And the staff continued to recite the CIP code instead of looking at the substance of the application, again leading the board to an erroneous decision. On page 9 of the board's own brief, recognition is given to the fact that during the application process and at the board hearing, the right graduate institute offered to allow the CIP code, if that's something the board insisted on having, be correctly identified as to whatever numeric number the board thought was appropriate. And rather than taking the opportunity to correct a numeric statistical analysis tool to conform to the application, the board took the direction from the staff and rejected the application on that basis. On page 29, the board's brief concedes that this CIP code was merely carried over from the cover sheet of the original application. In the end, however, on this issue for the standard in Part A1, the entire crux was whether or not the CIP code was correct. Now, in looking at the second standard, more analysis was given under a different statute, in this case the Academic Degree Act. Again, as to this, the board devotes at least three pages of analysis, two of which are almost spent completely quoting and analyzing requirements of the Academic Degree Act. This is the act that empowers the board to give permission to confer degrees in the state of Illinois. In the original application, of course, it applied. As we've reviewed, however, the decision issued by the board does not place any reliance on the Academic Degree Act, and rightly so. The Academic Degree Act has absolutely no application until such time as Wright may choose to apply for degree-conferring authority in the state of Illinois. Again, something under these rules that are expected to do within three years after they begin operations. Page 20 of the board's brief, again, focuses on the Academic Degree Act to make arguments to this court as to why the application had to be denied. It focuses on the language in that act that talk about degree programs to be offered and faculty requirements for those degree programs. A degree program is not here before the Board of Higher Education, and certainly not in this record. The board went on to again analyze the CIP code of education and criticize the faculty for not having enough of a cluster of faculty with degrees in education. Actually, even the board's own brief then backtracks and says, during the pendency of the application process, a number of faculty obtained higher degrees because time was passing, and those degrees were, in fact, in education. But they ignore that for this, focusing, of course, again, back on the initial error of the staff analysis of the CIP code. In all, as I said, there were three pages of the argument just for this section devoted to an act that has no application to the case. Ultimately, what the board's decision reveals is that the true reason for finding standard A4 as deficient was a criticism that the faculty did not have, in the staff analysis, the appropriate degrees at least one level higher than the degree that was going to be conferred. In other words, wanting someone with a doctorate level degree teaching master's level courses. Some inconsistency, of course, because at the doctorate level there is nobody higher, as was pointed out. In the arguments before the board, the representative of right identified that this is not part of the rules and is not a requirement. And notwithstanding that, we've quoted in the brief, the chairwoman said, but isn't it our policy in a policy guide? And, in fact, it's written here in the decision on page A7 that faculty should have a completed degree in the discipline they will teach or for which they will develop curricula at least one level above the courses being taught or developed. That language appears nowhere in the statute nor in any of the rules that were promulgated by the Board of Higher Education. And yet, in the discourse between the chairperson and the rights representative, that became the crux of the information sought by the board before voting on whether or not this criterion was met. In the decision, the board identifies from the staff analysis that the adjunct faculty have various degrees in anthropology, economics, education, philosophy, psychology, law. All of this is consistent with the fields of human development and especially for the multidisciplinary approach this program suggested. But the analysis concluded on the last page with the last sentence of the decision on the top of page A8 and the decision there states, based on the faculty identified in the application, the learning format, and identified course descriptions that are not in the discipline of education, the application does not meet approved standards. So from the very beginning the staff misanalyzed the entire application and misapplied the law. The analysis went on to not only do that, but to invite the board to make a decision based upon an unpromulgated policy guide instead of doing what it should do. It should have evaluated the six statutory criteria and it should have analyzed the 12 criteria that were promulgated in the rules. It did so and found that 10 were met. As to the two that they found not met, the decision is based upon criteria that don't apply, that don't apply to this application, and are not authorized by law. This is why we ask the court to reverse the decision of the Illinois Board of Higher Education with instruction to enter an order granting the approval. Thank you, Mr. Draper. Mr. Reset. Good afternoon, your honors. May it please the court, counsel. My name is Paul Reset. I'm an assistant attorney general for the state of Illinois and I represent the Illinois Board of Higher Education in this appeal. Although the board staff found many problems with the rights amended application, it focused on the two most glaring in recommending that the application be denied. If this court concludes that either one of these factors were not met, it should affirm the board because they have to meet all the different criteria that are set out. The first problem identified was that rights application did not satisfy the statutory and regulatory standards regarding showing that the objectives of its course programs were aligned with the institutional objectives that were conveyed to the board. After reviewing rights application, its proposed course descriptions, and the correspondence between the staff and Wright, as well as looking at the SIP, CIP code that Wright self-selected in education, the staff noted that there was a disconnect because all of the proposed courses were more aligned with psychology or counseling and they had nothing to do with the traditional education. Is Mr. Draper correct that the CIP code is really not even needed at all? Well, in and of itself, the CIP code would not result in a denial if it were incorrect. For example, if there was a mistake or if there was a clerical error, were someone meant to ask for a CIP code in history and mistakenly put one in biology? What if they left it off altogether? Again, it's not required. However, this is a collaborative process that the board works with these fledgling institutions and this is a code that is used throughout higher education. So it makes sense to figure out what your course area is going to be and what your program is going to be in because although he says that this is only used for statistical purposes in some arcane studies in Washington, D.C., in fact, CIP codes are used for accreditation, which is something that they claim that they're going to be seeking in the future. They're used for financial aid purposes. So there are more purposes than just statistics for having a CIP code. And again, if they had mistakenly said education because they weren't paying attention and then when we brought it to their attention that really this should be psychology and they agreed, then it would not be a problem. The problem here is that they self-selected education and then when we pointed out the disconnect, they dug their heels in and said, well, you know what? We understand your position, but we're sticking with education. Two of our faculty members recently got EDD degrees and we think education more properly describes our program than psychology. Well, speaking of digging in your heels, I was surprised by the tone of the board's findings. Are they always this direct, I guess I would say? Actually, no, Your Honor. Like I said, this is a collaborative process. And as the staff noted, they have not recommended denial of an application since 1997. So it's a very rare thing. But they've had extreme frustration with working with this particular organization and trying to improve the application because a lot of their suggestions were falling on deaf ears. And we talked about how in the brief approximately 200 cases there have been where proposed institutions have withdrawn their applications. But approximately half of those are eventually approved because you work with the board. When the board points out the weaknesses, you improve your application. But they said, you know what? We've amended it once. We're not interested in amending it any further. We'll take our chances in court. So they took it to circuit court, and the circuit court ruled against them. And now we're up another level. So the course descriptions all fell within the area of psychology. And they were claiming that this was an education program, which is something that is normally used to train educators. Things like classroom technique, how to prepare lesson plans, things like that, where Wright has admitted that its curriculum focuses on just three schools of psychology that vary in existential and developmental. So there was this huge disconnect between what they were insisting that their program was about and what, in fact, it really was about. If you look at the course descriptions, they're all about things like nurturing the inner self and personal power, things that have much more to do with psychology and counseling than with education in the traditional sense. And as you point out, the tone of the recommendation, in addition to the fact that the objectives were not aligned with what the courses were going to, in fact, teach the students, the court also noted that there was no depth in these courses, that there was a lack of focus, that they didn't fall clearly within a specific discipline. And Mr. Draper says that this was a multidisciplinary request. But actually, if you look at the record, that was their initial request. Their initial application gave a SIP code that was in the multidisciplinary field. However, when they submitted their amended application, they switched to education. And Wright specifically told the board that this was not, in the technical sense, a multidisciplinary program and that it was omitting any references to multidisciplinary programs from its application. So because it's not a multidisciplinary program, it needs to fall within a recognized discipline such as psychology and education. Excuse me for interrupting. We don't all get the record before oral arguments. What did they base their finding, what is in the record, that would indicate that the program is shallow and formless? Well, they had the proposed course catalog with the descriptions of the courses. And I quoted some of this in my brief. But they said things like, we're going to help you learn how to harness your personal power and improve every area of your life, improve your dating life, improve your relationships with your children, improve your physical health, your spirituality. They weren't grounded in traditional academic rigorous psychology studies. Like normally when someone gets a psychology degree, they learn how to treat patients. It's directed outward, where most of these courses had to do with improving yourself as a person. So it's more of a self-improvement kind of agenda than a traditional psychology program. So that's what the board was talking about when it talked about how, you know, and it was like they cherry-picked, even though it's not multidisciplinary, they're cherry-picking from different disciplines. So the students would be learning a little bit about everything, but not a lot about any one specific topic. And because it's not multidisciplinary, that really just doesn't make sense. So even if they had selected a SIP code in psychology, the application still would have been denied because of the shallowness and the lack of focus in the proposed courses that they were proposing to teach. The other issue had to do with the qualification of the faculty. And after reviewing the application and the other materials that were submitted, the board found that the faculty were not qualified to teach an educational program, which is what they self-identified as what they were going to be presenting. Out of their nine part-time faculty, only three had educational degrees, two of those having just received them within a few months of the board's decision denying the application. And even if they had been willing to switch their SIP code to psychology, and even if these courses were traditional psychology courses as recognized in the field, there were only two of their faculty that actually had psychology degrees. So the other four were trained in either anthropology, economics, law, or philosophy, which does not qualify them to teach either education or psychology courses. The other problem is, as the board noted, there's a common standard in higher education that faculty should have a degree in the subject that they're teaching, and that that degree should be one level above the course that they're teaching. And this makes perfect sense. You would not want someone with a history degree teaching a biology course, and also you don't want someone with less knowledge or the same knowledge as the students teaching a course level. So you wouldn't want someone with a master's or a bachelor's teaching doctoral students. And that was an initial problem that the board had in that five of their faculty only had master's, but they were going to be teaching a doctoral program. Now between the time that the amended application was filed and the denial in June of 2009, they either eliminated the faculty that only had master's, or two of them had obtained those ADD degrees from this fielding graduate university. However, the problem still remained that a lot of these degrees were not in the field that they would be teaching. Whether you look at this as an education program or a psychology program, the people that have degrees in economics, law, anthropology, and philosophy are not qualified to teach graduate level courses in psychology or education. Unless the court has further questions, we would ask that you affirm. Thank you. Thank you, counsel. Rebuttal, Mr. Graper? Yes, thank you. I think what the court just heard are a lot of arguments about what the board might like to be in the record and that might form the basis of the decision, but it wasn't. The decision was very specific in identifying the basis for deciding that the criteria weren't met. And as to criterion A1, in each of the three paragraphs devoted to that, the answer was, your CIP code in education doesn't match your course title, Human Development. And as I said, and as acknowledged in the board's brief, Wright invited the board to give an idea of what classification the board would want there and to accept it. And this is a numerical number that we're talking about, not the subject matter of the courses, not the qualifications of faculty. The board's sole decision on criterion A1 was over the CIP code. And then it was carried forward under criterion A4 to say your faculty don't have a high enough number who have a terminal degree in education. Now, in the presentation before the board, comparisons were made to similar programs also approved. I think Northwestern University was an example with a degree in Human Development where faculty had substantially the same kind of qualifications and that program was approved. In this case, however, the decision tells us what the board's reasoning was and it was all focused on this CIP code. At the beginning of argument, council suggested that there were numerous reasons why this application should be denied and in fact is attempting to invite, I guess, a second bite at the apple if the court disagrees with these two and finds that they were not lawfully followed or the law wasn't properly applied. And that simply can't be done. The decisions in writing, the staff analysis, and it was adopted, the motion was to approve that particular report. The board didn't say there are many deficiencies. The board said there are two and gave us the reasons why. And that's what has to be supported by this record. The law does not. So, council then argued for the board that having the wrong code number wouldn't cause a disqualification. And if that's the case, then why is it that when Wright said, we'll change it if you'll tell us what classification number you want us to use, we'll accept anyone you want, that that wasn't given. The council suggested that there's a lot of positive give and take in this and it improves the application process, but as Justice Myerscough, as you noticed, the tone of this is harsh and the board's own brief tells us why. In the past, I think he said since 1997, whenever there was a negative evaluation, in every case, over 200 prior applicants agreed to do what staff wanted, withdraw your application and submit a new one. And Wright didn't. Now, I don't know why motives should come into play, but there's a strong suggestion here that the motive for this decision is that the staff got their noses out of joint because somebody disagreed with the staff analysis and had the temerity to actually ask the board to make the final decision. And the staff disagreed, and that's why that argument is presented to you, that that's what should have happened. And that's reflected in the tone of the decision. It's reflected in the tone of the chairwoman's probing to Wright's representative about doesn't our policy guide require that faculty have a degree one level higher than that being taught? And the representative said, that's not in your rules. And the answer was, all the same, isn't that the policy we have always followed? Now, those are words that make it clear that there's a policy that's being applied that has never been promulgated. It's not in any of these criteria. It is one that's simply in an application guide. For these reasons, we have argued that the Administrative Procedure Act has been violated by enforcing a policy and using it as the very basis of the decision to deny an application when they haven't adopted that policy as required by law. And so, when you review all of this, it keeps coming back to the board misapplying the law and failing to recognize that this is an application to teach courses in Illinois. For degrees that Wisconsin has decided, Wisconsin will allow to be conferred at the institution's school in Wisconsin. All of the analysis that you've heard about the faculty qualifications are things that could be brought up within the next three years when Wright applies for degree conferring authority. At that time, it's appropriate. And if, in fact, the board feels that the quality of the programs is shallow, as was suggested, something that's not in the written opinion or decision of the staff or the board, if that's the case, the board will have the authority to say, we will not approve you to confer those degrees in Illinois. That's not the issue that was before the board. It's not what's before this court. And this court should reverse the decision with instructions to grant the application. Thank you, Mr. Draper.